# TAB 1

**Westlaw.**

Not Reported in F.Supp.
1997 WL 10004 (S.D.N.Y.)
(Cite as: 1997 WL 10004 (S.D.N.Y.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
COLONIAL PENN INSURANCE COMPANY,
Plaintiff,
v.
AMERICAN CENTENNIAL INSURANCE
COMPANY, Defendants.
No. 96 Civ. 6051 (MBM).

Jan. 10, 1997.

Mitchell M. Breit, Schoeman Marsh & Updike, New York City, Alfred W. Putnam, Jr., Patricia Proctor, Drinker Biddle & Reath, Philadelphia, PA, for plaintiff.

Eugene Wollan, Wayne R. Glaubinger, Renee M. Plessner, Mound, Cotton & Wollan, New York City, for defendants.

OPINION AND ORDER

MUKASEY, District Judge.

*1 Plaintiff Colonial Penn Insurance Company ("CPI") petitions to confirm an arbitration award against American Centennial Insurance Company ("ACI"). ACI opposes confirmation and cross-moves to vacate the award, arguing that: 1) the arbitrators manifestly disregarded the law, and 2) the arbitrators violated 9 U.S.C. § 10(a)(4) by exceeding their powers. ACI moves also to amend the caption pursuant to Fed. R. Civ. P. 15 to substitute British International Insurance Company ("BII") for itself as defendant, claiming that BII is the real party in interest. For the reasons given below, the arbitration award is confirmed, and defendant's motions to vacate the award and amend the caption are denied.

I.

The facts, as relevant to this motion to confirm, and drawn from the parties' submissions, including their arbitration briefs, are as follows: CPI is a Pennsylvania corporation with its principal place of business in Norristown, Pennsylvania. (Petition ¶ 1) ACI is a Delaware corporation with its principal place of business in Wilmington, Delaware. (Id. ¶ 2) Their dispute concerns a series of reinsurance agreements. [FN1]

> FN1. A reinsurance contract is one by which a reinsurer agrees to indemnify a primary insurer for losses it pays to its policyholders. Such contracts are of two general types. Treaty insurance is obtained in advance of actual coverage and may cover any risk the primary insurer covers. The contract is formed when the primary insurer "cedes" part of the premiums for its policies and the losses on those policies to the reinsurer. A facultative reinsurance contract is one obtained to cover a particular risk. The reinsurer does not assume liability for losses paid in either case; its only obligation is to indemnify the primary insurer.
> In the Matter of the Liquidation of Midland Ins. Co., 79 N.Y.2d 253, 258, 582 N.Y.S.2d 58, 60 (1992).

In 1983, CPI entered into a quota share reinsurance agreement [FN2] with Dominion Insurance Company of America. Under this agreement, CPI issued facultative certificates in its own name, underwritten by a new company formed by Dominion called Domain Managers, Inc. Dominion assumed 90% of the risk insured by these certificates and CPI retained 10% of the risk. [FN3] (Id. at 2, 4; Def. Ex. D, ACI's Pre-Hearing Brief at 2)

> FN2. Quota share reinsurance is a type of pro-rata reinsurance contract whereby the reinsurer agrees to indemnify the primary insurer for a fixed percentage of any losses under the primary insurance policy, in exchange for a corresponding percentage of the premiums. See Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 15.02[a] (8th ed. 1995); see also Reinsurance 661 (Robert W. Strain ed. 1980) ("A form of pro rata reinsurance ... in which the reinsurer assumes an agreed percentage of each insurance being insured and shares all premiums and losses accordingly with the reinsured."). The quota share reinsurance agreement may relate to either treaty or facultative reinsurance, although in the

Not Reported in F.Supp.  
1997 WL 10004 (S.D.N.Y.)  
(Cite as: 1997 WL 10004 (S.D.N.Y.))

Page 2

present case, it related to facultative reinsurance.

FN3. This is known as a "fronting" arrangement, where a licensed insurer issues a policy with the understanding that another party will reinsure the fronting insurer for most, if not all, of the claims on that policy. This is often done to enable a company -- *i.e.*, the reinsurer -- to issue policies in a state in which it is not licensed to do business. Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 15.02[c] (8th ed. 1995).

Before entering this agreement with CPI, Dominion had its own program through which it issued facultative reinsurance certificates or policies. (Pl. Ex. A at 2) Dominion had arranged excess of loss reinsurance with ACI and others for its own program, the first layer of which covered losses between $150,000 and $500,000 and the second layer of which covered losses between $500,000 and $1 million. (Pl. Ex. A at 2; Petition, Ex. A) Therefore, on May 14, 1984, these excess of loss reinsurance agreements, the "Assumed Casualty Facultative Business First Excess of Loss Reinsurance Contract" and the "Assumed Casualty Facultative Business Second Excess of Loss Reinsurance Contract" (together, the "excess of loss agreements"), which originally named Dominion as the sole reinsured, were amended to cover the facultative certificates issued in CPI's name, 90% of which had been assumed by Dominion. The amendments named both Dominion and CPI "in respect of business underwritten by Domain Managers, Inc. and their quota share reinsurers as their interests may appear." (Petition, Ex. A, Endorsement No. III) These excess of loss agreements contained an arbitration clause which provided that differences or disputes between any subscribing reinsurer and reinsured relating to the agreements would be subject to arbitration in New York under the rules of the American Arbitration Association, and governed by New York law. (Petition, Ex. A)

*2 As noted above, ACI was one of the subscribing reinsurers to the excess of loss agreements and assumed a percentage of the risk of excess losses on the facultative certificates issued by Dominion and CPI. The amount of risk assumed by ACI is undisputed and irrelevant for the purposes of these motions.

These excess of loss agreements were essentially indemnification agreements, and therefore Dominion and CPI were required initially to pay the full amount of any claims on the underlying insurance policies -- even claims in excess of the $150,000 for which they retained the risk -- and only then to seek reimbursement from the reinsurers. In 1986, Dominion entered liquidation. (Glaubinger Aff. ¶ 5; Pl. Ex. A at 4) As a result, CPI paid 100% of the claims under the facultative reinsurance certificates issued in its name. (*Id.*) CPI sought indemnification from its reinsurers for 100% of the portion of these payments covered by the excess of loss agreements.

In 1987, Dominion's liquidator sued CPI for sums allegedly due under their quota share reinsurance agreement. That suit was settled in 1992. (Glaubinger Aff. ¶ 6) The details of that settlement are irrelevant here, except for one provision which assigned to CPI all of Dominion's claims against the reinsurers under the excess of loss reinsurance agreements. (Glaubinger Aff. ¶ 7) The settlement was subsequently amended when CPI learned of outstanding debts which Dominion allegedly owed some of the excess of loss reinsurers and which those reinsurers claimed should be offset against amounts owed to CPI under the excess of loss agreements. (Glaubinger Aff. ¶ 9) This addendum to the settlement permitted CPI, *inter alia*, to make a claim against the Dominion estate for any offsets actually paid and stated that neither party believed that any such offsets were due. (Glaubinger Aff., Ex. 4)

Meanwhile, ACI refused to pay CPI for ACI's share of the payments due under the excess of loss agreements. ACI claimed that CPI was entitled only to 10% of the payments due under the excess of loss agreements because CPI had retained only 10% of the risk, and the reinsurers had intended to reinsure CPI only up to the amount of its retained risk. In 1990, ACI and CPI entered a commutation and release agreement under which, *inter alia*, ACI paid CPI the 10% it agreed it owed. However, the agreement expressly stated that it did not "apply to any business ceded to [ACI] by Dominion Insurance Company of America in respect of business underwritten by Domain Managers, Inc. as [CPI's] quota share reinsurer." (Glaubinger Aff., Ex. 2 at 4) Thus, there remained a dispute over whether ACI was obligated under the excess of loss agreements to reimburse CPI for the 90% of losses originally assumed by Dominion but later paid by CPI as a result of Dominion's liquidation.

CPI filed an arbitration demand on December 28, 1994 to resolve ACI's obligations for these losses and ACI filed its answer and counterclaim soon thereafter. (Petition ¶ 7) In April 1996, the arbitrators issued a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1997 WL 10004 (S.D.N.Y.)
(Cite as: 1997 WL 10004 (S.D.N.Y.))

Page 3

partial/final award which provided:

> *3 [CPI and ACI] shall resolve the amount due to [CPI] from [ACI], within thirty (30) days from the date of transmittal of this Award to the Parties, or if the parties cannot agree in that time period, an application may be made to the panel to hold a hearing on damages.

(Def. Ex. A) When the parties were unable to agree on the amount due to CPI, the arbitrators held a damages hearing. On July 16, 1996, the arbitrators issued a final award, granting CPI $590,894, plus interest since December 24, 1994. The arbitrators awarded ACI a premium adjustment in the amount of $208,810 with interest since December 31, 1992, which the award indicated had already been offset against CPI's award. (Petition, Ex. B)

When ACI refused to pay the balance due under the award, CPI filed this petition to confirm. ACI opposes the petition and has cross-moved to vacate the arbitration award, arguing that it: 1) was in manifest disregard of the law, and 2) violated 9 U.S.C. § 10(a)(4) because the arbitrators "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." ACI argues also that the interest on the premium adjustment should be calculated from December 1986 rather than December 1992, and that, if the award is confirmed, it should be interpreted as requiring that interest on the premium adjustment of $208,810 continue to accrue until payment and that such interest should be offset against the interest payments to CPI on the $590,894. Finally, defendant moves to amend the caption to substitute BII for itself as defendant because, it claims, BII is now the real party in interest.

II.

ACI argues first that the arbitration award was in manifest disregard of New York law controlling assignments and offsets. It claims that CPI's only right to payment arises from Dominion's assignment of its claims -- *i.e.*, that CPI had no direct right to recover from the reinsurers on 90% of the excess losses. ACI argues that Dominion, the assignor, owes ACI premiums on other policies totalling more than $4.9 million (Def. Ex. C at 4), and that ACI is entitled to offset those outstanding premiums due from Dominion against any money it owes to CPI, the assignee, because an assignee cannot assert a stronger claim than its assignor.

In general, the party challenging the arbitration award has the burden of demonstrating that the award should be vacated. See *Wall St. Assoc., L.P. v. Becker Paribas Inc.*, 27 F.3d 845, 848 (2d Cir. 1994). "'Manifest disregard of the law' by arbitrators is a judicially-created ground for vacating their arbitration award." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986). "In order to advance the goals of arbitration, courts may vacate awards only for an overt disregard of the law and not merely for an erroneous interpretation," *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993), and "[a] court must not disturb an award simply because of an arguable difference of opinion regarding the meaning or applicability of the laws." *W.K. Webster & Co. v. American President Lines, Ltd.*, 32 F.3d 665, 669 (2d Cir. 1994). Rather, "[t]he governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable. We are not at liberty to set aside an arbitration panel's award because of an arguable difference regarding the meaning or applicability of laws urged upon it." *Merrill Lynch*, 808 F.2d at 934; see also *Siegel v. Titan Indus. Corp.*, 779 F.2d 891, 892 (2d Cir. 1985). Where the arbitrators have failed to document the reasoning behind their decision -- a perfectly acceptable practice in arbitration -- courts must consider the facts and the law to determine whether the allegedly disregarded law was clearly applicable and ignored. See *Folkways Music Publishers*, 989 F.2d at 112; *Siegel*, 779 F.2d at 894 ("Where 'a ground for the arbitrator's decision can be inferred from the facts of the case, the award should be confirmed.'") (citation omitted).

*4 Here, defendant's argument must fail because it has not demonstrated that the law of assignments and offsets was both clearly applicable and ignored by the arbitrators. Defendant has almost exactly restated here its arguments to the arbitrators regarding the applicability and content of New York law of assignments and offset. It claims that "[d]espite the irrefutable fact that any right Colonial Penn might have to recovery could only be the result of the assignment to it by Dominion's liquidator of Dominion's 90% interest in the EOL Contracts, the Panel ignored the fundamental principles of law that govern the rights of assignees." (Def. Mem. at 9) However, if the facts of the case colorably permit a finding that CPI's right to payment from ACI flowed directly from the excess of loss agreements rather than indirectly through an assignment from Dominion, then the law of assignment and offset would not clearly apply and the arbitrators' award would not be in manifest disregard of the law.

As plaintiff argued to the arbitrators, the excess of loss agreements name both Dominion and CPI as the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1997 WL 10004 (S.D.N.Y.)  
(Cite as: 1997 WL 10004 (S.D.N.Y.))

Page 4

reinsured parties "as their interests may appear." (Petition Ex. A) Article V of the agreements provides that "No claim shall be made hereunder ... unless and until the reinsured has first sustained an ultimate net loss in excess of $150,000 [or in the second excess loss agreement, $500,000]..." (*Id.*) (brackets added) It continues, "It is expressly understood and agreed that the liability of the reinsurer shall, in all instances, follow the liability of the reinsured for business the subject matter hereof." (*Id.*) Article VI defines "ultimate net loss" as "the actual loss incurred by the reinsured in settlement of claims or suits or in satisfaction of judgements after making deductions for all recoveries, all salvages and all claims upon other reinsurance (other than quota share reinsurance) whether collected or not." (*Id.*) Thus, the agreements appear to require that the reinsurers pay the reinsureds based upon actual payments by those reinsureds to the primary insureds. It is undisputed that as a result of Dominion's liquidation, CPI rather than Dominion made all the payments on the primary insureds' claims. CPI argued before the arbitrators that because it was named as a reinsured and had sustained the losses, it was entitled to full payment from ACI on the losses, rather than merely 10%.

ACI argued before the arbitrators, however, that all the parties to the excess of loss agreements understood that CPI would be entitled to only 10% of any payments made under the primary insurance policies because that was the degree of risk CPI retained under its quota share agreement with Dominion. (Def. Ex. D, Def. Post-Hearing Brief at 3) Moreover, the excess of loss agreements provide that

> [t]his contract applies only to that portion of any certificate which the reinsured retains net for its own account. In calculating the amount of any loss hereunder and in computing the amount or amounts in excess of which this contract attaches, only loss or losses in respect of that portion of any certificate which the reinsured retains net for its own account shall be included.

*5 (Petition, Ex. A, art. VII) This clause could be interpreted as limiting payments under the agreements to the amount of risk actually retained by the reinsured party -- in CPI's case, 10%. (Def. Ex. D, ACI's Post Hearing Brief at 6-8) Moreover, defendant argued that although CPI remained fully liable to the primary insureds for any claims, "[t]his fact has absolutely nothing to do with either Colonial Penn's or Dominion's right to recover under the [excess of loss] Contracts." (Def. Ex. D, ACI's Pre-Hearing Brief at 6)

CPI argued in reply that the excess of loss agreements do not contain any language limiting the reinsurers' obligation to CPI to 10% of the payments made under the primary insurance policies. In fact, CPI argued, the excess of loss agreements state specifically that "[t]he reinsured may maintain quota share reinsurance with respect to business the subject matter of this reinsurance, however, if such quota share reinsurance is maintained it shall be disregarded for the purposes of this contract." (Petition, Ex. A, art. VII) This clause could be interpreted to mean that Dominion's obligation under the quota share reinsurance agreement to reimburse CPI for 90% of CPI's payments to insureds under the facultative reinsurance certificates issued in CPI's name is irrelevant in determining ACI's and other reinsurers' indemnification obligations under the excess of loss agreements. Again, the excess of loss agreements state that they cover Dominion, CPI and their quota share reinsurers "as their interests may appear." (Petition, Ex. A; Pl. Ex. B at 5-7) CPI argued that this term refers to their interests as they developed over time as a result of payments of claims on the primary insurance policies. Thus, according to CPI, it is entitled directly under the excess of loss agreements to full indemnification for all payments it made under the primary insurance policies that fall within the excess of loss agreements' coverage. Further, ACI cannot offset premiums Dominion owes to ACI from other transactions against payments ACI owes to CPI under the excess of loss agreements because there is no mutuality between the parties to the two sets of debts. Finally, plaintiff explained to the arbitrators that Dominion assigned its rights under the excess of loss agreements to CPI in order to protect the reinsurers against potential double recovery. (Pl. Ex. B at 3)

This summary of the arguments before the arbitrators demonstrates that there was a colorable basis for the award and that the arbitrators did not manifestly disregard the law. In finding for CPI, the arbitrators may have adopted CPI's interpretation of the excess of loss agreements, and thereby determined that plaintiff had a direct right of recovery under the agreements. Each excess of loss agreement states that it covers Dominion and CPI "as their interests may appear," implying that their interests will vary depending on their payments under the primary insurance policies. In addition, the agreements do not mention Dominion's and CPI's respective percentages of the risk as allocated under the quota share agreement. Moreover, it is not an unreasonable interpretation of the agreements to view the more specific language of the quota share reinsurance exclusion as trumping the clause limiting coverage to retained risk, thereby rendering the risk allocation between Dominion and CPI irrelevant for reinsurance purposes. Thus, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1997 WL 10004 (S.D.N.Y.)  
(Cite as: 1997 WL 10004 (S.D.N.Y.))

Page 5

arbitrators may have concluded that CPI was directly covered for all payments made to primary insureds within the policy limits. It is not my role to decide in this confirmation proceeding whether or not that is a correct interpretation of the excess of loss agreements. Suffice it to say that this is a plausible interpretation.

*6 Under such an interpretation of the excess of loss agreements, the laws of assignment would not apply. Further, there could be no offset between Dominion's debts to ACI and ACI's obligations to CPI because the parties to the debts are not mutual. *See In the Matter of the Liquidation of Midland Ins. Co., 79 N.Y.2d 253, 264, 582 N.Y.S.2d 58, 64 (1992)* ("Before an offset will be allowed, the claims must be mutual, *i.e.,* owed between the same persons and in the same right."). Although *Midland* held that there was such mutuality when debts were owed by an insolvent insurer and owed to the insolvent insurer's liquidator, there is no clear authority for holding that there is such mutuality when debts are owed merely to and from parties reinsured under the same reinsurance policy. Because it is possible that the arbitrators adopted plaintiff's interpretation of the excess of loss agreements, which is at least colorably correct, I cannot find that the arbitrators disregarded a clearly applicable body of law. *See I/S Stavborg (O.H. Meling, Manager) v. National Metal Converters, 500 F.2d 424, 431-32 (2d Cir. 1974)* ("All of appellant's claims here reduce to the proposition that the arbitrators misconstrued the contract.... Whatever arbitrators' mistakes of law may be corrected, simple misinterpretations of contracts do not appear one of them.").

Finally, defendant argues that the arbitrators' award of the premium adjustment offset shows that the arbitrators acknowledged that CPI was obligated for some of Dominion's debts to ACI but chose to disregard offset law in relation to other of Dominion's debts to defendant. Although the parties' submissions are particularly opaque on this point, this premium adjustment appears to be of a different nature from the premiums on other policies that Dominion owes ACI. Unlike the Dominion premium debts, the premium adjustment awarded by the arbitrators to ACI appears to stem from a direct obligation from CPI to ACI, not an obligation owed by Dominion to ACI.

The excess of loss agreements contain a specific provision governing the payment of the reinsurance premiums. The agreements establish a provisional reinsurance premium -- *i.e.,* a percentage of the total premiums paid on the primary insurance policies. The agreements provide that the reinsureds first must pay a deposit premium. Periodically, the reinsureds are required calculate the actual premium payments they receive from the primary insureds, and then either charge the reinsurer or pay the reinsurer the difference between the deposit premium and the provisional premium. (Petition, Ex. A, art, VIII) The agreements provide also that in relation to each year that the excess of loss agreements are in place, "the reinsurer shall return to the reinsured the difference, if any, between fifty five percent (55%) of the premium (net of commission) developed hereunder and losses incurred hereunder." (*Id.*) Finally, the agreements provide for the calculation of a final premium:

> *7 The first calculation shall be made twenty four (24) months following the end of the year of account and any return of premium shall thereupon be made. Recalculations and appropriate adjustments, if any, shall be made annually thereafter. A final calculation and adjustment, if any, shall be made twelve (12) years following the end of the year of account.

(*Id.*) It was out of these provisions that the premium adjustment arose. Because the contract obligated all reinsureds to make these adjustments, the excess of loss agreements could be interpreted to impose this adjustment obligation directly upon plaintiff CPI, even though under the quota share agreement with Dominion CPI was to receive only 10% of the premiums. The arbitrators could have interpreted the agreements in this plausible manner, in which case there would be mutuality between the premium adjustment owed by CPI to ACI and the payments owed by ACI to CPI, and an offset would be appropriate. This distinguishes these debts from the premiums owed by Dominion to ACI on different policies to which CPI is not a party.

Furthermore, even if the arbitrators had interpreted the excess of loss agreements as imposing on Dominion only the obligation to make these premium adjustments, I cannot say that awarding this offset demonstrates a manifest disregard for the law. Both parties conceded in the arbitration that plaintiff owed defendant these funds (Glaubinger Aff. ¶ 19), and therefore the arbitrators' decision to award these funds does not indicate necessarily that they believed the law of assignment and offset to be applicable here, but ignored it in rejecting defendant's other offset claim. The arbitrators' award of an offset for an adjustment in the reinsurance premiums does not demonstrate that the arbitrators manifestly disregarded the law.

III.  
Defendant argues next that the arbitrators "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject

Not Reported in F.Supp.  
1997 WL 10004 (S.D.N.Y.)  
(Cite as: 1997 WL 10004 (S.D.N.Y.))

Page 6

matter submitted was not made." 9 U.S.C. § 10(a)(4). Defendant argues that the basic issue which the arbitration panel was charged to resolve was whether ACI breached the excess of loss agreements by failing to pay CPI. ACI claims that a comment made by one of the arbitrators during the damages hearing demonstrates that the arbitrators did not base their decision upon an interpretation of the contract, but rather went outside the contract to reach their award. Further, ACI claims that the lack of any opinion explaining the arbitrators' reasoning further demonstrates that the decision was not based on contract principles and that the arbitrators exceeded their powers. One court has stated in reference to 9 U.S.C. § 10(a)(4):

> Arbitrators are not required to provide the rationale for their award, and courts generally will not look beyond the lump sum award in an attempt to analyze the reasoning processes of the arbitrators.... Therefore, in a case like this one where a party claims the arbitrators based their holding on a claim not properly before the panel, the party challenging the award must show that no proper basis for the award can be inferred from the facts of the case.

*8 *Wall St. Assoc.*, 27 F.3d at 849.

Here, as noted above, there is indeed reason to believe that the arbitrators based their decision on a plausible interpretation of the excess of loss agreements and that there was a proper basis for the award. Further, the lack of any opinion setting forth the arbitrators' reasoning cannot be a basis for overturning the award. [FN4] In addition, unlike *Harry Hoffman Printing, Inc. v. Graphic Communications Int'l Union, Local 261*, 950 F.2d 95 (2d Cir. 1991), where the arbitration panel opinion revealed a reliance on improper grounds in reaching its award, there is no evidence that these arbitrators relied upon improper grounds in reaching their decision.

> FN4. Further, neither party demanded at the outset of the arbitration that the arbitrators write an opinion. (Pl. Mem. at 1 n.1)

The only evidence defendant presents in support of its assertion that the arbitrators exceeded their powers is a statement by one of the arbitrators at the damages hearing that: "The Panel didn't speak to the issue of breach of contract." (Def. Ex. E at 46) However, this statement alone is insufficient to invalidate the award. Plaintiff claims that the arbitrator may have been merely noting that the panel had not decided the time a breach by defendant occurred, and was not saying that the panel had never addressed the issue of defendant's breach of contract. Defendant argues that the comment demonstrates that the arbitrators never considered whether defendant breached the agreements and therefore the award had no proper basis in law. It is impossible, however, to determine which interpretation is correct because the meaning of the arbitrator's comment is not apparent whether the comment is read in or out of context. However, because this was an isolated comment of only one of the arbitrators during a hearing on damages after the panel had resolved issues of liability, it cannot serve as a basis for determining the reasoning behind the arbitrators' decision. *Cf. Elite Inc. v. Texaco Panama, Inc.*, 777 F. Supp. 289, 292 (S.D.N.Y. 1991) (refusing to vacate arbitration award as exceeding arbitrators' powers on the basis of isolated comments by arbitrators during arbitration hearing). Because there is no evidence that the arbitrators exceeded their authority, the award cannot be vacated pursuant to 9 U.S.C. § 10(a)(4).

IV.

Defendant argues as well that it is entitled to interest on the premium adjustment from December 1986, rather than from December 1992 as determined by the arbitrators. During the damages hearing, plaintiff argued that interest should run from 1992 because the records required to calculate the premium adjustment were inaccessible to them until 1992, when Dominion's liquidator finally provided such records. Because this is a plausible explanation for the arbitrators' award, I must assume that the arbitrators accepted this argument. Defendant has failed to present any evidence that this finding was invalid on any ground. Thus, defendant must be arguing that this was an error of law or fact. Such errors are insufficient to overturn an arbitration award and thus the arbitrators' award of interest from December 1992, rather than from December 1986, must be confirmed.

*9 Defendant claims also that interest should accrue on its premium adjustment during the period between the arbitration award and the final resolution of this matter. Plaintiff contends that because the arbitration award already offsets defendant's premium adjustment against the total amount owed to plaintiff, and interest is currently accruing to plaintiff only upon the net amount owed to it by defendant, the award should not be interpreted to allow interest to accrue on the premium adjustment.

A look at the final award reveals that plaintiff is correct. The award states that "[t]he award of five hundred ninety thousand eight hundred ninety four dollars ($590,894.00), to claimant includes the offset of two hundred eight thousand eight hundred ten

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1997 WL 10004 (S.D.N.Y.)
(Cite as: 1997 WL 10004 (S.D.N.Y.))

Page 7

dollars ($208,810.00), due to respondent." (Petition, Ex. B) As plaintiff notes, "It follows that [ACI] is being credited with interest on its $208,810 because it is not paying interest on $799,704. The reduction of the claim to $590,894 saves [ACI] the interest cost on $208,810 worth of Colonial Penn's claim -- thereby crediting [ACI] with interest on its premium adjustment." (Pl. Mem. at 15) Defendant is not entitled to interest on the premium adjustment from the date of the arbitration award to the present.

"Absent a statutory basis for modification or vacatur, the district court's task [is] to confirm the arbitrator's final award as mandated by [the Federal Arbitration Act]." Blue Bell, Inc. v. Western Glove Works Ltd., 816 F. Supp. 236, 243 (S.D.N.Y. 1993); see Wall St. Assoc., 27 F.3d at 848-49. Because I find that there are no grounds for vacating the arbitration award, plaintiff's petition to confirm the final arbitration award is granted.

V.

Finally, defendant moves to amend the caption pursuant to Fed. R. Civ. P. 15 to substitute BII for ACI as defendant because it claims that BII is the real party in interest. Defendant claims that effective August 29, 1996, "ACIC ceded and transferred to BIIC certain of ACIC's reinsurance business which includes the excess of loss reinsurance agreements ("EOL Contracts") that are in dispute in this action in which Petitioner seeks to confirm the final award." (Glaubinger 11/18/96 Aff. ¶ 2; Rothseid Aff. ¶¶ 2-3) Plaintiff opposes the motion, arguing that it is really a motion to substitute a party pursuant to Fed. R. Civ. P. 25(c). Plaintiff argues that this motion should be denied because it has not consented to a novation of the excess of loss agreements and therefore defendant remains liable.

Plaintiff is correct that this motion is essentially a motion to substitute a party, not simply a motion to amend the pleadings. [FN5] See Alfadda v. Fenn, No. 89 Civ. 6217, 1993 WL 307757 (S.D.N.Y. Aug. 6, 1993); see also Hernandez-Avila v. Averill, 725 F.2d 25, 28 n.4 (2d Cir. 1984) ("A caption may of course be amended with the permission of the court.... Courts generally will allow an amendment under Rule 15 to correct technical defects in the caption."). Rule 25(c) provides, "In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party." Fed. R. Civ. P. 25(c). "Because joinder or substitution under Rule 25(c) does not ordinarily alter the substantive rights of parties but is merely a procedural device designed to facilitate conduct of a case, a Rule 25(c) decision is generally within the district court's discretion." Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc., 13 F.3d 69, 71-72 (3d Cir. 1993). "The decision to order substitution or joinder is to be made by considering how the conduct of the lawsuit will be most facilitated." Federal Deposit Ins. Corp. v. Tisch, 89 F.R.D. 446, 448 (E.D.N.Y. 1981).

> FN5. Even were I to apply the standards governing amendments under Fed. R. Civ. P. 15, plaintiff's motion would be denied. A court should not give a party permission to amend a pleading if the proposed amendment would result in undue prejudice to the opposing party. See, e.g., Allstate Ins. Co. v. Administratia Asigurarilor De Stat, 875 F. Supp. 1022, 1029 (S.D.N.Y. 1995). Here, plaintiff would sustain undue prejudice as a result of substituting BII for ACI because ACI is the party liable for the arbitration award.

*10 Here, the motion must be denied because substitution of BII for defendant would not facilitate the conduct of this action. BII appears to be a British corporation (Pl. Mem. in Opp. to Motion to Amend Caption at 2-3), and therefore an assignment of the reinsurance contract obligations to BII would adversely affect plaintiff's rights and requires its consent. See, e.g., Beck v. Manufacturers Hanover Trust Co., 481 N.Y.S.2d 211 (Sup. Ct. New York County 1984) ("It is hornbook law that any transfer of contractual duty so as to discharge the original obligor, requires the obligee's assent where such transfer alters the substance of the contract or otherwise materially affects the obligee's rights.... There can be no doubt that the purported assignment or transfer of a duty to pay under an instrument from an American to a foreign corporation, may adversely affect the obligee's rights."). Plaintiff never agreed to substitute BII as a party to the excess of loss agreements and ACI is still liable for payments due under those agreements. The arbitration award, which I have confirmed, requires that ACI make certain payments under those agreements. ACI cannot evade these obligations by assigning its interests to another party and therefore ACI will not be dismissed from this action.

In addition, it makes little sense to add BII as a party at this late stage of the litigation. BII was not a party to the arbitration. Its obligation to satisfy the arbitration award as assignee of the excess of loss agreements raises issues to be resolved between defendant and BII,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1997 WL 10004 (S.D.N.Y.)  
**(Cite as: 1997 WL 10004 (S.D.N.Y.))**

Page 8

and is not material to defendant's obligation to plaintiff under the arbitration award. Defendant's motion is denied.

\* \* \*

For the foregoing reasons, plaintiff's petition to confirm the arbitration award is granted, and defendant's motions to vacate the arbitration award and to amend the caption are denied.

SO ORDERED.

1997 WL 10004 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

. 1996 WL 33489690 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to American Centennial Insurance Company's Cross-Petition to Vacate the Arbitration Award and in Support of Colonial Penn's Petition to Confirm the Arbitration Award (Oct. 04, 1996)

. 1:96CV06051 (Docket) (Aug. 09, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.