**TAB 4**

Westlaw.

Not Reported in F.Supp.2d                                                                                                   Page 1
2003 WL 21251584 (E.D.N.Y.)
(Cite as: 2003 WL 21251584 (E.D.N.Y.))

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Dana Y. BANKS and David B. Mounsey, Plaintiffs,
v.
CONSUMER HOME MORTGAGE, INC., Michael Ashley, individually and as principal
owner of CHM, Robert Standfast, individually and as President of CHM, Michael
Parker, individually and as an officer/employee of CHM, Option-To-Buy Ltd.
(OTB), Mindy S. Ashley, individually and as President of OTB, Suzanne
Schiavetta, individually and as Secretary of OTB, Stephen Weintraub, Esq., the
Foreclosure Network of New York (FNNY), Gary Lewis, individually and as
President of FNNY, Joshua Smiling, Jason J. Ashley, Esq., Anton Sarlo, Roy
Angevine, Kenneth Golden, Esq., Joseph Obenauer and United States Department of
Housing and Urban Development, Defendant.
No. 01-CV-8508 (ILG).

March 28, 2003.

Purchasers of real property at allegedly inflated price sued vendor, mortgagee, real estate broker and individuals, alleging fraud and violation of New York deceptive practices law. Defendants moved to dismiss. The District Court, Gasser, J., held that: (1) fraud claim was stated against husband and wife, who controlled vendor, broker and mortgagee; (2) claim of fraud was stated against secretary of vendor, who attended closing to conceal relationship between president and attorney for purchasers; (3) fraud and deceptive practices claims were stated against broker; (4) fraud claim was stated against president of mortgagee; (5) fraud and deceptive practices claims were stated against mortgagee's attorney; and (6) fraud claim was stated against building inspector.

Motions granted in part and denied in part.

West Headnotes

[1] Conspiracy ⚷—18
91k18 Most Cited Cases

[1] Fraud ⚷—30
184k30 Most Cited Cases
Purchasers of house stated claim of fraud and conspiracy to commit fraud, under New York law, against husband and wife, by alleging that couple controlled vendor, real estate broker and mortgagee, and were aware of scheme to sell house for excessive price.

[2] Consumer Protection ⚷—8
92Hk8 Most Cited Cases

[2] Consumer Protection ⚷—35
92Hk35 Most Cited Cases
Purchasers of house stated claim under New York deceptive practices law, against husband and wife, by alleging that couple controlled vendor, real estate broker and mortgagee, and were aware of scheme to sell house for excessive price. McKinney's General Business Law § 349.

[3] Conspiracy ⚷—18
91k18 Most Cited Cases
Purchasers of real property stated claim of conspiracy to commit fraud, under New York law, against secretary of vendor, by alleging that secretary attended closing in lieu of vendor's president, in order to conceal from purchasers familial relationship between president and attorney representing purchasers.

[4] Consumer Protection ⚷—8
92Hk8 Most Cited Cases

[4] Consumer Protection ⚷—35
92Hk35 Most Cited Cases
Purchasers of real property stated claim of violation of New York deceptive practices law, against secretary of vendor, by alleging that secretary attended closing in lieu of vendor's president, in order to conceal from purchasers familial relationship between president and attorney representing purchasers; action was designed to mislead reasonable consumer acting reasonably under circumstances. McKinney's General Business Law § 349.

[5] Brokers ⚷—34

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2003 WL 21251584 (E.D.N.Y.)  
(Cite as: 2003 WL 21251584 (E.D.N.Y.))

Page 2

65k34 Most Cited Cases
Purchasers of real property at allegedly inflated price stated claim of fraud, under New York law, against real estate broker, its representative and its president, by alleging that defendants knowingly overstated fair market value of house by $100,000, understated need for repairs, and promised that entire amount of initial payment would be applied to purchase price when in fact part went to closing costs, and then took active steps to conceal fraud from purchasers.

[6] Consumer Protection ⚷8
92Hk8 Most Cited Cases
Purchasers of real property at allegedly inflated price stated claim that New York deceptive practices law was violated, against real estate broker, its representative and its president, by alleging that defendants knowingly overstated fair market value of house by $100,000, understated need for repairs, and assured purchasers they could rely upon them in transaction. McKinney's General Business Law § 349.

[7] Fraud ⚷30
184k30 Most Cited Cases
Purchasers of house at allegedly excessive price stated claim of fraud, under New York law, against president of mortgagee, through allegations that president knew about and had directed false representations that purchasers had to finance through mortgagee and need not seek outside appraisers.

[8] Conspiracy ⚷18
91k18 Most Cited Cases
Purchasers of real estate at allegedly inflated price stated claim of conspiracy to commit fraud, under New York law, against attorney representing mortgagee at closing, by alleging that attorney pressured purchasers into closing without adequately reviewing closing documents.

[9] Fraud ⚷30
184k30 Most Cited Cases
Purchasers of real property at allegedly inflated price stated claim of fraud, under New York law, against attorney for mortgagee, by alleging that attorney aided and abetted process by pressuring purchasers into closing, even though attorney did not himself make any fraudulent representations.

[10] Consumer Protection ⚷8
92Hk8 Most Cited Cases

[10] Consumer Protection ⚷35
92Hk35 Most Cited Cases
Purchasers of real property at allegedly inflated price stated claim that New York deceptive practices law, as interpreted by federal court, was violated by attorney for mortgagee, through aiding and abetting price deception by pressuring purchasers into closing, by not disclosing familial relationship between owner of mortgagee and purchasers' attorney, and by facilitating improper withdrawal of funds from an escrow. McKinney's General Business Law § 349.

[11] Conspiracy ⚷18
91k18 Most Cited Cases
Purchaser of real property at allegedly inflated price stated claim of conspiracy to commit fraud, under New York law, against building inspector, by alleging that inspector concealed existence of numerous severe structural defects.

[12] Consumer Protection ⚷8
92Hk8 Most Cited Cases
Purchasers of real property to allegedly inflated price stated claim that building inspector violated New York deceptive practices law, by alleging that inspector prepared summary of work needed to be done on property that omitted reference to several major structural defects. McKinney's General Business Law § 349.

Richard A. Wagner, Brooklyn Legal Services Corp." A", Brooklyn, New York, for Plaintiffs.

Peter A. Cross, Jacob, Medinger & Finnegan, LLP, New York, New York, for Plaintiffs.

Joel M. Markowitz, Lamb & Barnosky, Melville, New York, for Defendants CHM, Michael Standfast and Michael Parker.

Debra Pitman, and Nicholas Chrysanthem, McManus, Collura & Richter, P.C., New York, New York, for Kenneth E. Golden.

Noah Nunberg, L'Abbate, Balkan, Colavita & Contini, LLP, Garden City, New York, for Defendant Stephen Weintraub.

Richard Harrison, Phillips, Nizer, Benjamin, Krim & Ballon LLP, Garden City, New York, for Defendants Michael Ashley, Mindy Ashley, OTB and Suzanne Schiavetta.

David H. Eisenberg, Hauppague, New York, for Defendants FNNY, Gary Lewis and Joshua Smiling.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Louis M. DiLuzio, Law Offices of Howard B. Felcher, New York, New York, for Defendant Anton Sarlo.

Law Office of Michael J. Meenan, P.C., Mineola, New York, for Defendan Joseph Obenauer.

Philip J. Miller, Assistant United States Attorney, Brooklyn, New York, for Defendant United States Department of Housing and Urban Development.

*MEMORANDUM AND ORDER*

GLASSER, J.

*1 This action is based upon the purchase and financing of residential real property by Plaintiffs. Plaintiffs claim that numerous parties, including the seller, the finance company, real estate brokers, an appraiser, an inspector, a contractor and the attorneys involved in closing the deal conspired to defraud Plaintiffs in a predatory lending scheme that allegedly induced Plaintiffs to purchase the property at an inflated price. Plaintiffs' claims sound in the federal Truth-in-Lending Act ("TILA"), the Equal Credit Opportunity Act ("ECOA"), the New York Deceptive Practices Act, *see* N.Y. Gen. Bus. § 349, and common law fraud and breach of fiduciary duty.

Most defendants now move to dismiss the First Amended Verified Complaint (the "Complaint"), [FN1] primarily for failure to state a claim for fraud or under Section 349 and for failure to plead fraud with particularity. For the reasons stated below, these motions are denied.

> FN1. Plaintiffs have filed a Second Amended Verified Complaint, which amended claims solely with regard the United States Department of Housing and Urban Development ("HUD"). The government initially moved to dismiss the claims against HUD (seeking money damages), but briefing on that motion was stayed voluntarily by the Plaintiffs and HUD. In this latest pleading, plaintiffs seek declaratory and injunctive relief against the Secretary of HUD related to its policing of transactions similar to those alleged in the complaint. Plaintiffs' claims against HUD set forth in its First Amended Verified Complaint are presumed to be withdrawn.

*BACKGROUND*

According to the Complaint, plaintiffs Dana Y. Banks and David B. Mounsey are longtime friends who were in the market to purchase jointly a multi-family house, and heard of the Foreclosure Network of New York, Inc. ("FNNY"), a real estate brokerage with access to moderate priced homes. On February 24, 2000, Banks and Mounsey went to the offices of FNNY and there met its salesperson, Joshua Smiling. Smiling showed plaintiffs a 3-family house at 415 Pennsylvania Avenue in Brooklyn, New York. Smiling told plaintiffs that he was very familiar with the property, that the house need significant "cosmetic" repairs, that he knew precisely what needed to be done, and that the purchase loan would also finance the repairs.

*A Sales Price Is Determined*

During the following week, Smiling and plaintiffs discussed the house further. Smiling described to plaintiffs his commitment as a fellow African-American to helping them fulfill the American dream of home ownership by finding the right house at the right price. This race-based pitch was allegedly part of a planned method of operation engaged in by FNNY and its employees and management.

On or around March 2 or 3, 2000, plaintiffs met again at FNNY's offices with its president Gary Lewis. An extensive interview was conducted that covered plaintiffs' income, finances and debts. No sales price was given at this meeting, pursuant to a practice where FNNY (and other defendants, according to plaintiffs' allegations) do not provide sales quotes based on the fair-market value of the property or an asking price set by the sellers, but instead based on an analysis of the maximum amount buyers can afford to borrow.

On or about March 8, 2000, plaintiffs met with Lewis again at FNNY's offices and brought with them various financial data and information that Lewis had requested. Plaintiffs also met Michael Parker at this meeting, who Lewis introduced as a "sales representative" for Consumer Home Mortgage, Inc. ("CHM"). Prior to the meeting, Defendants [FN2] had determined that plaintiffs could raise about $12,000 in cash and could be convinced to borrow up to $275,000 for purchase and repair of the property. Lewis and Smiling told plaintiffs that the fair market value of the property "as is" was $214,000, and that plaintiffs would need to borrow and put into escrow another $67,000 for repairs. In fact, on January 20, 2000, defendant Option-To-Buy, Ltd. ("OTB") had purchased the property in the identical condition for only $115,000 from RF Properties, Inc. Mindy Ashley is alleged to be the president of OTB, and her husband Michael S. Ashley is alleged to be a principal of CHM,

Not Reported in F.Supp.2d  
2003 WL 21251584 (E.D.N.Y.)  
(Cite as: 2003 WL 21251584 (E.D.N.Y.))

Page 4

and to control both OTB and FNNY. Plaintiffs allege that Smiling and Lewis knowingly concealed the existence of the relationship between OTB and the Ashley family in order to conceal the family relationship of the sellers to defendant Jason J. Ashley, Esq., whom FNNY and CHM provided to plaintiffs as their attorney at the closing.

> FN2. In the complaint, plaintiffs do not specify which defendants made this determination regarding the amounts which plaintiffs could pay and borrow.

*The Property is Appraised and Inspected*

\*2 Exclusive of certain costs, Lewis and Smiling told plaintiffs that the total purchase price (including repairs) was approximately $288,000. Lewis and Smiling told plaintiffs that this was a fair, reasonable and affordable price. Lewis and Smiling told plaintiffs that their $12,000 cash payment would be credited as a down payment. However, no one told plaintiffs that in fact $7,500 of the down payment would be used without their knowledge or consent for closing costs.

Prior to the sale to plaintiffs, Lewis and Smiling, as well as Michael S. Ashley and Mindy Ashley, and in collusion with the appraiser Joseph Obenauer and the inspector Anthony Sarlo, arranged for the preparation of an appraisal inspection report. Smiling, Lewis and Sarlo all vouched that both Obenauer and Sarlo were entirely independent of the seller OTB, the broker FNNY and the lender CHM, that both Obenauer and Sarlo had special expertise in their respective areas, and that both Obenauer and Sarlo's evaluations were particularly reliable and honest as they were performed on behalf of HUD. Parker, Lewis, and Smiling also told plaintiffs that they did not need to hire their own engineer, inspector or appraiser because Obenauer and Sarlo would handle those tasks more cheaply.

Obenauer prepared an appraisal. The appraisal stated that the fair market value of the house as of March 9, 2000, was $258,000. However, an addendum to the appraisal stated that the fair market value was only $143,000, apparently without explanation. The appraisal also noted that the terms of the most recent sale (on January 20, 2000, to OTB) were not available, that no structural defects or evidence of water damage existed, and that a variety of other types of defects such as exposed wiring, leaky plumbing, broken windows, and inadequate water pressure, did not exist. The appraisal did not note the existence of Thomas Jefferson High School, a densely populated school with an extremely high crime rate, across the street from the property, or reference what effect the school would have on the fair market value of the property. [FN3] Plaintiffs allege that these statements and omissions were false and misleading, and that their purpose was to deceive both plaintiffs and HUD as to the "as is" and "as repaired" fair market value of the property. On March 18, 2000, plaintiffs were shown a copy of the appraisal and asked to sign, but were not given a copy of it. Plaintiffs did note that the appraisal stated that the range of purported comparable sales was between $258,00 and $273,000, and that it also stated that it could not report on the January 20, 2000 sale of the property except that the broker had listed it for $230,990.

> FN3. The Complaint does not allege why the existence of the high school would not have been obvious to plaintiffs.

Sarlo prepared a summary of estimated repair costs which plaintiffs allege intentionally ignored and omitted serious existing structural and other defects that would have cost an additional $75,000 to $100,000 to repair. Had plaintiffs known of these repairs, it would not only have caused them to abandon the deal, but it would also have rendered the property ineligible for the FHA mortgage insurance provided by HUD and a 203k rehabilitation loan. [FN4]

> FN4. The term 203k rehabilitation loan apparently refers to HUD-administered loans pursuant to Section 203(k) of the National Housing Act, 12 U.S.C. § 1709(k), and the regulations promulgated thereunder. See 24 C.F.R. § 203.440 et seq.. According to HUD's website,
> When a homebuyer wants to purchase a house in need of repair or modernization, the homebuyer usually has to obtain financing first to purchase the dwelling; additional financing to do the rehabilitation construction; and a permanent mortgage when the work is completed to pay off the interim loans with a permanent mortgage. Often the interim financing (the acquisition and construction loans) involves relatively high interest rates and short amortization periods. The Section 203(k) program was designed to address this situation. The borrower can get just one mortgage loan, at a long-term fixed (or adjustable) rate, to finance both the acquisition and the rehabilitation of the property. To provide

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21251584 (E.D.N.Y.)
(Cite as: 2003 WL 21251584 (E.D.N.Y.))

Page 5

funds for the rehabilitation, the mortgage amount is based on the projected value of the property with the work completed, taking into account the cost of the work. To minimize the risk to the mortgage lender, the mortgage loan (the maximum allowable amount) is eligible for endorsement by HUD as soon as the mortgage proceeds are disbursed and a rehabilitation escrow account is established. At this point the lender has a fully-insured mortgage loan.
U.S. Dep't of Housing and Urban Development, *rehab a home w/ HUD's 203(k) rehab program* (2002), *available at* http://www.hud gov/offices/hsg/sfh/203k/203kabou.cfm (viewed Oct. 17, 2002). In other words, HUD assumes much of the risk that the lender might bear.

*3 Parker and Lewis told plaintiffs that in order to be eligible for financing they had to use CHM as the lender even though plaintiff Mounsey told Parker, Lewis, and Smiling that as a veteran he was approved for a mortgage by the Veterans Administration. Parker, Lewis and Smiling also told plaintiffs that they would need to place the repair loan proceeds in escrow with CHM, and that CHM would exercise exclusive control over hiring a contractor for repairs.

*The Closing on the Property*

Plaintiffs were also told (by unnamed defendants) that counsel would be provided to represent them at closing. Jason J. Ashley was thus assigned, but he never disclosed to plaintiffs that he was the cousin of Mindy Ashley, OTB's president, or that her husband Michael Ashley was a principal in CHM and controlled FNNY. Plaintiffs never met or spoke with Jason J. Ashley until the closing on March 24, 2000, although he is listed as counsel for plaintiffs on a rider to the backdated contract of sale. Steven Weintraub, Esq., who was the attorney for OTB and Mindy Ashley, allegedly intentionally backdated the contract of sale and, with the cooperation of Jason J. Ashley, was able to get plaintiffs to sign the back-dated contract. Weintraub was also aware of the family relationship between Jason J. Ashley and Mindy Ashley, but allegedly remained silent about this alleged conflict in furtherance of the overall scheme. After the closing, plaintiffs repeatedly tried to contact Jason J. Ashley to obtain a final set of closing documents and to direct him to compel the contractor hired to conduct the repairs of the property (co-defendant Roy Angevine) and CHM to complete the repairs. Jason J. Ashley has never returned their calls or responded otherwise and has never delivered a final closing set of closing documents to plaintiffs. Jason J. Ashley did not respond to the complaint filed in this action, and a default judgment already has been entered against him.

At the closing on March 24, 2000, Suzanne Schiavetta, the Secretary of OTB (Compl.¶ 10), attended on behalf of OTB and initialed various parts of the contract of sale. Plaintiffs allege that Schiavetta knowingly participated at the closing to conceal the familial relationship between Mindy and Jason J. Ashley.

Plaintiffs allege that the defendants, including Weintraub and Kenneth Golden, Esq. (attorney for CHM) did not provide advance copies of any closing documents and instead handed them to plaintiffs at the closing for execution without allowing any time for review. Jason J. Ashley then assured plaintiffs that the closing documents were in order and instructed plaintiffs to execute them.

In addition to the contract of sale, plaintiffs also executed a loan application, a borrowers' certificate for HUD and VA, a contractor agreement to hire Angevine to conduct repairs, Sarlo's specification of repairs and narrative scope of work (the "scope of work"), a pre-signed, uncompleted draw request authorizing the release of funds prior to the commencement of any repair or rehabilitation, and other uncompleted draw requests. Although the total cost of repairs in the inspection reports was listed at about $51,000, plaintiffs were induced to borrow $67,220 as a "Repair Escrow" that was paid to CHM. CHM has never provided an accounting for these funds. Sarlo and Angevine subsequently signed draw requests that certified that all work had been satisfactorily completed, although in fact none of the work listed in Sarlo's scope of work was commenced before closing, and very little work had been done by April 13, 2000, when plaintiffs were induced to execute a form releasing $59,000 to Angevine. A substantial amount of the work listed in the scope of work has never been completed.

*4 A rider was annexed to the contract of sale that stated that the Federal Housing Commissioner had appraised the fair market value of the subject premises as not less than $258,000. However, the Federal Housing Commissioner had not issued, approved or even seen such an appraisal by the time of closing. [FN5]

Not Reported in F.Supp.2d
2003 WL 21251584 (E.D.N.Y.)
(Cite as: 2003 WL 21251584 (E.D.N.Y.))

Page 6

FN5. Additionally, the plaintiffs make a number of allegations about hidden or misstated charges in the mortgage documents. None of these allegations are at issue in the different motions to dismiss.

*STANDARD FOR MOTIONS TO DISMISS*

When deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must take all allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *FD Property Holding, Inc. v. U.S. Traffic Corp.,* 206 F.Supp.2d 362, 369 (E.D.N.Y.2002) (internal quotation marks omitted). However, the Court may consider matters of public record, such as court decisions, statutes, and documents such as briefs filed with courts and other public bodies. *See, e.g., Papasan v. Allain,* 478 U.S. 265, 268 n. 1, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) ("Although this case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b), we are not precluded in our review of the complaint from taking notice of items in the public record"); *Rothman v. Gregor,* 220 F.3d 81, 92 (2d Cir.2000).

*DISCUSSION*
I. Legal Standards for Fraud, Conspiracy to Defraud and General Business Law § 349

A. Fraud

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester,* 273 F.3d 153, 156 (2d Cir.2001) (citing *Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)).

"In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be pled with particularity." Fed.R.Civ.P. 9(b). To satisfy Rule 9(b), plaintiff must "specifically plead those events which give rise to a strong inference that the defendants had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Connecticut Nat'l Bank v. Fluor,* 808 F.2d 957, 962 (2d Cir.1987); *see S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.,* 84 F.3d 629, 634 (2d Cir.1996) (a fraud claim "must allege facts that give rise to a strong inference of fraudulent intent."). "Such intent can be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino v. Citizens Util. Co.,* 228 F.3d 154, 168-69 (2d Cir.2000).

*5 However, allegations regarding the knowledge of the other participants and their roles, and the state of mind of the participants can be averred generally. *See* Fed.R.Civ.P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally.") "Thus, while the actual ... fraud alleged must be stated with particularity ... the requisite intent of the alleged [perpetrator of the fraud] need not be alleged with great specificity.... We apply the more general standard to scienter for the simple reason that a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000) (quotations and citations omitted).

B. Conspiracy to Defraud

As this Court has noted previously, for purposes of pleading the conspiracy itself, "it is important that within the pleader's ability to do so, and without going into unnecessary detail, the opposing party be informed of the nature of the conspiracy charged.... Where possible, there should be some details of time and place and the alleged effect of the conspiracy.... Moreover, great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of pleading." *777388 Ontario Ltd. v. Lencore Acoustics Corp.,* 142 F.Supp.2d 309, 319 n. 4 (E.D.N.Y.2001) (Glasser, J.). With those caveats in mind, "a plaintiff in New York must allege the primary tort and four elements: (a) a corrupt agreement between two or more persons; (b) an overt act in furtherance of the agreement; (c) the parties' intentional participation in the furtherance of a plan or purpose; and (d) the resulting damage or injury." *Id.,* 142 F.Supp.2d at 319.

Finally, plaintiffs argue that although not specifically pled, the allegations also support claims for aiding and abetting fraud. In order to state a claim for aiding and abetting fraud under New York law, plaintiffs must allege "(1) the existence of the primary fraud, (2) the aider and abettor's knowledge of the fraud, and (3) substantial assistance by the aider and abettor." *Primavera Familienstifung v. Askin,* 130 F.Supp.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

450, 488 (S.D.N.Y.2001), *modified in part on reconsideration,* 137 F.Supp.2d 438 (S.D.N.Y.2001). However, the knowledge requirement for aiding and abetting liability is actually a higher degree of scienter than required for fraud liability. *Id.* at 508 ("the scienter requirement scales upward when activity is more remote") (citations omitted); *see National Westminster Bank USA v. Weksel,* 124 A.D.2d 144, 149, 511 N.Y.S.2d 626, 630 (1st Dep't 1988) (Aiding and abetting fraud "is not made out simply by allegations which would be sufficient to state a claim against the principal participants in the fraud."). Therefore, New York law and Rule 9(b) require allegations which can support a "strong inference" of fraudulent intent. *Primavera,* 130 F.Supp.2d at 507. [FN6]

> FN6. In *Primavera*, the court did note that a heightened scienter requirement would not apply where the aider and abetters role in the fraud was a symbiotic role, meaning that the aider and abetter allegedly was aware that its actions would be used by the principal fraudfeasors to deceive the victims and that the aider and abettor consciously continued to assist the principal fraudfeasor with such knowledge. 130 F.Supp.2d at 508 (noting that brokers who readily revised marks at the behest of principal to reflect inaccurately the market price with the knowledge that it would be disseminated to investors could be liable for aiding and abetting liability).

C. General Business Law § 349

*6 A claim under Section 349 must "as a threshold matter, ... charge conduct of the defendant that is consumer-oriented." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 25, 647 N.E.2d 741, 744, 623 N.Y.S.2d 529, 532 (1995). The New York Court of Appeals defined that as conduct that "potentially affects similarly situated consumers." *Id.* at 27, 647 N.E.2d at 745, 623 N.Y.S.2d at 533. "To make out a prima facie case under Section 349, a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith,* 230 F.2d 518, 521 (2d Cir.2000). "Deceptive acts" are defined objectively "as acts that are likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* (internal quotations omitted). Although contracts unique to the parties are not covered by Section 349, "plaintiff ... need not show that the defendant committed the complained-of acts repeatedly--either to the same plaintiff or to other consumers--but instead must demonstrate that the acts or practices have a broader impact on consumers at large." *Oswego Laborers' Local 214,* 85 N.Y.2d at 25, 647 N.E.2d at 744, 623 N.Y.S.2d at 532.

However, because Section 349 does not require proof of intent to deceive or justifiable reliance, courts generally hold that Rule 9(b) does not apply to § 349 claims. *Pettit v. Celebrity Cruises,* 153 F.Supp.2d 240, 265 (S.D.N.Y.2001); *Hedaya Bros., Inc. v. Fed. Ins. Co.,* 799 F.Supp. 13, 15 (E.D.N.Y.1992).

II. The Individual Motions

A. Michael Ashley, Mindy Ashley and OTB

[1][2] Defendants Michael Ashley, Mindy Ashley, and OTB jointly move to dismiss the First and Third Causes of Action (conspiracy to defraud and fraud) and the Eighth Cause of Action (Gen. Business Law § 349). The Ashleys do not challenge the sufficiency of the actual statements and actions attributed to other defendants, such as the statements made by Smiling, Lewis, or Parker, or the actions taken by Jason J. Ashley. Instead, the Ashleys contest the claims of fraud and conspiracy to defraud based on two grounds. First, the Ashleys note that the Complaint fails to allege any interaction between them and plaintiffs, or that the Ashleys directed anyone to conceal or provide information to the plaintiffs. Michael Ashley's role is alleged to be solely that of one who controls directly or indirectly CHM, OTB, and FNNY. In terms of the conspiracy to commit fraud, for example, the Complaint alleges that "Michael Ashley, acting through other private defendants," undertook almost all of the actions pled, from Smiling's statements that the property only needed "cosmetic" repairs to CHM's payments of escrow monies to Angevine before and after the closing.

Second, the Ashleys argue that "mere knowledge of fraud is not enough" to impose liability for fraud. However, that is true only for claims of fraudulent concealment. When affirmative statements are made by agents of another, the principal can be held liable. "In actions for fraud, corporate officers and directors may be held individually liable if they participated in or had knowledge of the fraud, even if they did not stand to gain personally." *Polonetsky v. Better Homes Depot, Inc.,* 97 N.Y.2d 46, 55, 760 N.E.2d 1274, 1278-79, 735 N.Y.S.2d 479, 483-84 (2001) (president of corporation held liable for fraud and violation of New York consumer protection law). Mindy Ashley is

Not Reported in F.Supp.2d  
2003 WL 21251584 (E.D.N.Y.)  
(Cite as: 2003 WL 21251584 (E.D.N.Y.))

Page 8

alleged to be the president of OTB, and is alleged to have had knowledge of the fraud, so she may be held individually liable. Michael Ashley is alleged to be a principal in CHM, and to otherwise control, directly or indirectly, CHM, OTB and FNNY. The Complaint should be interpreted liberally to read this allegation to mean that Michael Ashley is in fact an officer of CHM, and therefore liable for any misstatements made by Parker since he had knowledge of the fraudulent conduct. [FN7]

> FN7. Plaintiffs submitted a public record on file with the Secretary of State for Georgia, where CHM lists Michael Ashley as the Chief Financial Officer of CHM. This Court can take judicial notice of this official filing by CHM. *Kramer v. Time Warner*, 937 F.2d 767, 774 (2d Cir.1991) (taking judicial notice of contents of corporate filings with SEC); *see McMichael v. U.S. Filter Corp.*, No. EDCA 99-182VAP, Fed. Sec. L. Rep. ¶ 91,406, 2001 WL 418981, at *8 (E.D.Ca. Feb.23, 2001) (taking judicial notice of certificate of incorporation in Delaware); *Redding v. Freeman Products, Inc.*, No. 94 C 398, 1995 WL 410922, at *2 (N.D.Ill. July 10, 1995) (taking judicial notice of certificates of good standing filed with Illinois Secretary of State). It should also be noted that the plaintiffs in the companion case before this Court, captioned *Vaughn v. Consumer Home Mortgage, et al.*, 01 CV 7937(ILG) (E.D.N.Y.), allege that Michael Ashley is in fact an officer of CHM.
> Michael Ashley vigorously disputes this fact by affidavit where he swears that he has never held an ownership interest in CHM, nor has he ever been an officer or director of CHM. Plaintiffs in turn submitted other documents, including credit reports and Dun & Bradstreet reports which list Michael Ashley as an officer of CHM. This evidence falls outside the complaint and will not be considered on his motion to dismiss.

*7 Similarly, the failure to plead with particularity specific fraudulent statements from or actions taken by the Ashleys is not fatal to the claims. In this case, the complaint makes clear that the liability of the Ashleys is predicated upon directing or exerting substantial control over CHM, OTB and FNNY, and the employees of those companies, as well as acting with the other defendants to carry out the alleged fraud. The facts alleged demonstrate strong circumstantial evidence of an intent to defraud, since they allege knowledge of the misrepresentations made and facts of both motive (significant and unusual financial gain) and opportunity (created by the conspiracy's efforts to steer plaintiffs to other members of the conspiracy).

Finally, the Ashleys argue that because none of the allegations against them suggest an intent to generally deceive the public and because plaintiffs do not allege that they were injured in reliance upon the allegedly deceptive acts, the Complaint fails to state a claim under Section 349. However, it is well settled that Section 349 covers real estate transactions, *see Polonetsky*, 97 N.Y.2d at 53, 760 N.E.2d at 1277, 735 N.Y.S.2d 479, 482, and covers the principals of the companies that undertake the deceptive practice. *Id.*, at 55, 760 N.E.2d at 1278-79, 735 N.Y.S.2d at 483-84. Moreover, the complaint casts the defendants' practices as one of an ongoing predatory practice from which one can infer the general deception of the public. As to plaintiffs' injuries, they clearly allege that because of the deceptive practices alleged, plaintiffs are now burdened with a mortgage far in excess of the value of the house, have bought a house with structural defects undisclosed by the seller, the broker, the inspector, the appraiser or their agents, and have needlessly and unwittingly paid numerous fees and other charges. The Complaint states a claim against the Ashleys under Section 349.

B. Suzanne Schiavetta

[3][4] Schiavetta is the Secretary of OTB, and attended the closing for the property to sign on behalf of OTB. Plaintiffs allege that Schiavetta's role at the closing was to "front" for OTB's owner, Mindy Ashley, in order to conceal the Ashleys' ownership of OTB and their relationship with the attorney Jason J. Ashley, to whom other defendants steered the plaintiffs and on whom plaintiffs relied to validate the propriety of plaintiffs' execution of the mortgage and other closing documents.

Although Schiavetta's role in the conspiracy may be limited to this one time appearance, the complaint alleges that she knew that her role was to conceal the connection between Mindy Ashley and Jason J. Ashley. This knowledge and her subsequent actions on behalf of OTB are sufficient to support the existence of a corrupt agreement between Schiavetta and the other defendants, and also to establish her intentional participation in furtherance of the agreement. Accordingly, the conspiracy claim against Schiavetta is not be dismissed.

*8 Similarly, Schiavetta's role in concealing the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21251584 (E.D.N.Y.)
(Cite as: 2003 WL 21251584 (E.D.N.Y.))

Page 9

relationship between Mindy and Jason J. Ashley in order to close the deal would qualify as an "act [ ] that [is] likely to mislead a reasonable consumer acting reasonably under the circumstances," *Maurizio,* 230 F.2d at 521, and therefore states a claim under Section 349.

Furthermore, since Schiavetta is alleged to have "knowingly 'fronted"' to conceal Mindy Ashley's role, it would appear that she is liable as an officer for OTB's activities. *See Polonetsky,* 97 N.Y.2d at 55, 760 N.E.2d at 1278- 79, 735 N.Y.S.2d at 483-84 (officers are liable for fraud committed by corporation with actual knowledge of the officer).

C. FNNY, Lewis and Smiling

FNNY, Lewis and Smiling (collectively, the "FNNY Defendants") jointly move to dismiss the First, Third and Eighth Causes of Action. The FNNY Defendants argue that the complaint fails to set forth with particularity allegations of fraud or conspiracy, that the allegations fail to state a claim for fraud, and that the allegations fail to state a claim under Section 349.

1. Pleading with Particularity

[5] Plaintiffs make numerous allegations about the participation of Lewis and Smiling (and thus FNNY) in the fraud, including that: Smiling stated the house needed "cosmetic repairs" that could be financed with the purchase price loan; they steered plaintiffs away from independent professionals that would contradict this evaluation or otherwise alert plaintiffs to problems in the transaction; they stated that the fair market value of the house in "as is" condition was over $100,000 more than was paid only two months prior; they stated that plaintiffs' cash payment of $12,000 would be used as a down payment; and they stated that the total purchase price was fair and reasonable.

The FNNY Defendants first focus on the lack of particulars regarding the actual conspiracy, such as when the parties actually agreed to act in concert and the terms of that agreement, as opposed to the specific acts of fraud. As to allegations of the particulars of the conspiracy itself (as opposed to the fraudulent conduct of its members), the allegations give the FNNY defendants more than sufficient notice of what the claims are and therefore satisfy plaintiffs' pleading requirements under Rule 9(b) and Rule 8.

Where the FNNY Defendants focus on specific allegations of fraudulent conduct, the allegations are sufficiently pled with particularity. Thus, plaintiffs' allegations that Sarlo ignored structural defects in his inspection and scope of work estimate are pled with sufficient particularity because they identify precisely what statement was made and why it was a misrepresentation. This is no different from plaintiffs' allegations that FNNY (through Smiling and Lewis) misrepresented the condition of the property and its fair market value: the allegations identify who made the misrepresentation, approximately when it was made, and the substance of the misrepresentation. As to the other allegations about which the FNNY Defendants complain, such as a failure to particularize which repairs covered by the scope of work were incomplete at closing or were never done, these allegations are not the "fraud" itself, but rather the effects of the fraud and could be proved to show that the scope of work itself was fraudulently made.

2. Does the Complaint State a Claim for Fraud?

*9 The FNNY Defendants argue that plaintiffs have neither made allegations of knowing misrepresentation nor of reasonable reliance. As to the knowing misrepresentation, the allegations regarding Smiling and Lewis' knowledge that the statements are untrue may be averred generally, *see* Fed.R. Civ. P. 9(b), as long as the facts alleged "show that defendants had both motive and opportunity to commit fraud, or ... constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino,* 228 F.3d at 168-69 (2d Cir.2000). The complaint sufficiently pleads facts (such as Smiling and Lewis' alleged misstatements about the fair market value) that provide strong circumstantial evidence of fraudulent conduct.

As to the issue of reasonable reliance, New York law generally follows the rule of *caveat emptor* in real estate transactions and requires a buyer to ascertain independently the value of the property. *Stambovsky v. Ackley,* 169 A.D.2d 254, 257, 572 N.Y.S.2d 672, 675 (1st Dep't 1991). However, it is equally true that fraud may exist where a seller actively conceals the facts or induces the other party to forbear inquiry into the circumstances. *Bethka v. Jensen,* 250 A.D.2d 887, 888, 672 N.Y.S.2d 494, 495 (3d Dep't 1998) (holding that deletion of reference in prospectus to possibility that additional assessment might be required indicated active concealment that imposed a duty to disclose information truthfully); *Haberman v. Greenspan,* 82 Misc.2d 263, 266, 368 N.Y.S.2d 717, 721 (Sup.Ct. Richmond Co.1975) (Titone, J.) ("This is especially true ... where the party acquainted with the facts deliberately endeavors to put obstacles in the way of the other party so as to prevent his learning the truth.")

Not Reported in F.Supp.2d  
2003 WL 21251584 (E.D.N.Y.)  
(Cite as: 2003 WL 21251584 (E.D.N.Y.))

Page 10

(quoting C.J.S. Vendor and Purchaser § 57); *Nash v. Gay Apparel Corp.*, 27 Misc.2d 903, 904, 213 N.Y.S.2d 94, 95 (Sup.Ct.N.Y.Co.) ("if the vendor knew them to be untrue, intended to mislead, and factors existed whereby the purchaser relying on such representations could not or would not make inquiries he otherwise would have made."), *aff'd without op.*, 13 A.D.2d 942, 218 N.Y.S.2d 574 (2st Dep't 1961). Plaintiffs have adequately alleged that the FNNY Defendants deliberately steered plaintiffs toward other members of the conspiracy in order to thwart an independent evaluation of the property.

Defendants argue that this "steering" was nothing more than showing plaintiffs a house for sale and making referrals to other business people--namely, the other defendants. However, it is clear that plaintiffs' allegations of steering are not geographic or property-specific, but rather involve deliberate efforts to discourage plaintiffs from looking beyond the members of the alleged conspiracy for assistance. For example, although a VA-approved loan was available for plaintiffs, Lewis explicitly told Plaintiffs that the deal must be done through CHM (an interested party in the transaction). [FN8]

> FN8. The FNNY Defendants also object to plaintiffs' purported failure to allege a "rational factual basis" for their allegation of damages of at least $350,000. Although plaintiffs may not be able to establish these damages, on a motion to dismiss this Court should accept the allegation as true. Further, given that the damages are caused by the fraudulent inducement to enter a mortgage for over $270,000 for a house whose market value may only be $115,000 and by alleged credit problems resulting from the transaction, it is at least conceivable that the actual damages may approach or even exceed the amount alleged.

3. The Section 349 Claim

*10 [6] The FNNY Defendants argue that no deception is alleged with respect to them since their only representation that was false was that the repairs would be made. (FNNY Mem. at 21.) This argument ignores a host of other alleged deceptive statements and acts, including the fair market value, that only cosmetic repairs were necessary, and that plaintiffs could rely upon them and their chosen colleagues in the transaction. These practices suggest an intent and a studied course of action to deceive the public generally. *See Polonetsky*, 97 N.Y.2d at 53, 760 N.E.2d at 1277, 735 N.Y.S.2d at 482. Moreover, the complaint casts the defendants' practices as an ongoing predatory one from which it can be inferred that the general deception of the public was its objective. *Id.* at 53-54, 760 N.E.2d at 1278, 735 N.Y.S.2d at 483. As such, it is not a "single-shot" transaction that is unique to the parties, but instead one that involves consumer-oriented behavior as defined by New York courts. *Oswego Laborers' Local 214*, 85 N.Y.2d at 25, 647 N.E.2d at 744, 623 N.Y.S.2d at 532 (Section 349 prohibits "acts or practices [that] have a broader impact on consumers at large").

As to plaintiffs' injuries, they clearly allege that because of the deceptive practices, plaintiffs are now burdened with a mortgage far in excess of the value of the house, bought a house with structural defects undisclosed by the seller, the broker, the inspector, the appraiser or their agents, and needlessly and unwittingly paid numerous fees and other charges.

Accordingly, the FNNY Defendants' motion to dismiss is denied.

D. Robert Standfast

[7] Standfast's argument is based upon the purported paucity of allegations involving him. Plaintiffs allege that Standfast is the president of CHM, that he caused CHM to undertake its fraudulent and deceptive acts, and that he was the immediate superior to Parker, who made fraudulent misrepresentations to plaintiffs at the behest of Standfast. [FN9] CHM (which does not independently move to dismiss the complaint) is alleged to have colluded with the other defendants to determine the sales price and to have misappropriated much of the approximately $67,000 held in escrow for repairs.

> FN9. Parker is alleged to have told plaintiffs they were required to use CHM as their mortgage lender, that plaintiffs did not need to seek outside appraisers or inspectors, and that plaintiffs had to borrow money only from CHM in order to finance the rehabilitation repairs.

As Standfast admits (Standfast Mem. at 8), under New York law corporate officers and directors are liable for frauds committed by the company where they had knowledge of the misrepresentation. *See, e.g., Marine Midland Bank v. John E. Russo Produce Co., Inc.*, 50 N.Y.2d 31, 44, 405 N.E.2d 205, 212, 427 N.Y.S.2d 961, 968-69 (1980) ("corporate officers and directors are not liable for fraud unless they ... have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21251584 (E.D.N.Y.)
(Cite as: 2003 WL 21251584 (E.D.N.Y.))

Page 11

actual knowledge of it"); *Polonetsky*, 97 N.Y.2d at 55, 760 N.E.2d at 1278-79, 735 N.Y.S.2d at 1278-79 (same). In this case, Standfast is not only alleged to have actual knowledge of the fraud but also to have directed it and otherwise actively colluded with the other defendants. Accordingly, his motion is denied.

E. Kenneth Golden

*11 Plaintiffs allege that Golden in the course of representing CHM (i) knowingly concealed material facts about the financing for the property and plaintiffs' ability to afford the property, (ii) knowingly concealed the familial relationship between Mindy and Jason J. Ashley, and (iii) sought to have plaintiffs execute documents at closing that should have been provided prior to closing and inserted blank draw requests into the closing documents. Plaintiffs argue that these allegations, and corresponding allegations that Golden violated ethical obligations as an attorney, suffice to establish "an extremely strong inference of his corrupt agreement with the other parties and of his fraudulent intent." (Pl. Opp. Mem. at 57.) As seen below, taking the allegations as true as this Court must on a motion to dismiss, plaintiffs have adequately stated a claim for conspiracy to defraud and aiding and abetting liability for the purported fraud.

[8] As to the conspiracy claim, the first element that must be shown to prove the existence of a conspiracy is that there is "a corrupt agreement between two or more persons." *777388 Ontario*, 142 F.Supp.2d at 319. Golden therefore first argues that plaintiffs fail to articulate "any nexus between Golden and the purported conspiracy." (Golden Mem. at 16.) In this case, plaintiffs are correct that a strong inference can be drawn from Golden's purported actions that he was a member of the conspiracy. For example, not providing documents prior to closing would imply that Golden had agreed to assist the other defendants in the purported conspiracy. Similarly, plaintiffs allege that his attendance at the closing and ensuring the execution of the sale and financing documents were executed was a necessary step in achieving the object of the fraud. Such allegations, if proved, would show "intentional participation in the furtherance of a plan" to defraud. *777388 Ontario*, 142 F.Supp.2d at 319.

[9] Golden also argues that no actual cause of action for fraud can be alleged, since he made no misrepresentation to plaintiffs. Although Golden may well have had an ethical duty to speak out at the closing, [FN10] the allegations support a claim for aiding and abetting fraud. Normally, the knowledge requirement for aiding and abetting liability is generally of a higher degree than is required for fraud liability. *See Primavera*, 130 F.Supp.2d at 508 ("the scienter requirement scales upward when activity is more remote") (citations omitted); *see National Westminster*, 124 A.D.2d at 149, 511 N.Y.S.2d at 630 (aider and abettor liability "is not made out simply by allegations which would be sufficient to state a claim against the principal participants in the fraud."). However, where the aider and abettor allegedly was aware that he would be enlisted by the principal fraudfeasors to deceive the victims and he knowingly did assist, his liability may be established. *Primavera*, 130 F.Supp.2d at 508. The allegations that Golden served as the attorney to an alleged fraudfeasor and facilitated the commission of the purported fraud at the closing are sufficient to state a claim for aiding and abetting.

> FN10. Golden's silence in the face of fraud may have triggered an ethical duty under the Disciplinary Rules to speak out and prevent the fraud. *See In re Westreich*, 212 A.D.2d 109, 629 N.Y.S.2d 417 (1st Dep't 1995) (holding that "attorney has a duty not to remain silent when he knows that the other party to a transaction is being defrauded by his client" and that assisting a client with fraud warrants disbarment); *but see National Westminster, supra*, 124 A.D.2d at 148, 511 N.Y.S.2d at 630 ("Nor was the firm under any ethical obligation to disclose what knowledge it might have had concerning its client's alleged impending fraud.") Golden may thus have had a duty to speak, and his failure to do so could state a cause of action for fraud.

*12 [10] As to the Section 349 claim, it is unclear whether the statute would apply to Golden, since he personally did not conduct any transaction with plaintiffs, but merely served as an agent of CHM. A review of the caselaw does not reveal whether an *agent* (as opposed to the principal) of a company that violates Section 349 can be liable for those violations. Similarly, no reported decision appears to inform whether a claim exists for aiding and abetting a deceptive practice, or otherwise conspiring to carry out a deceptive practice. Given that Section 349 is "a remedial statute" that requires "a liberal construction and application", *New York Public Interest Research Group, Inc. v. Insurance Information Institute*, 140 Misc.2d 920, 925, 531 N.Y.S.2d 1002, 1006 (Sup.Ct.N.Y.Co.1988), aff'd, 161 A.D.2d 204, 554 N.Y.S.2d 590 (1st Dep't 1990), there is no reason to doubt that aiding and abetting liability exists. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

elements of an aiding and abetting claim should track those of fraud, and require (1) the existence of the primary deceptive act or practice, (2) the aider and abettor's knowledge of the deceptive act or practice, and (3) substantial assistance by the aider and abettor. In this context, it must be noted that Section 349 does not have a scienter requirement. Applying this test to the facts at hand, plaintiffs have alleged that they were the victims of a deceptive act or practice; that Golden knew of the deceptive practice; and that he lent substantial assistance to the principals by structuring the closing so as to hinder plaintiffs' ability to review timely the documents, by remaining silent about the familial relationship between Jason J. and Mindy Ashley and by inserting blank draw slips into the closing documents to enable CHM to withdraw funds from escrow. Such allegations suffice to support a claim under Section 349.

F. Stephen Weintraub

Plaintiffs allege that Weintraub represented the seller OTB at the closing, that he included a backdated contract of sale, and, like Golden, remained silent about the conflict posed by Jason J. Ashley's representation of plaintiffs and presented documents for execution at closing without providing plaintiffs sufficient time to review them. For the same reasons as described with respect to Golden's motion, Weintraub's motion to dismiss pursuant to Rule 12(b)(6) is denied.

G. Anton Sarlo

[11] Sarlo is alleged to have led plaintiffs to believe that he would conduct an inspection of the house on behalf of HUD and that he had special expertise as an inspector under the FHA; to have produced for plaintiffs a backdated scope of work statement detailing the repair and rehabilitation work that needed to be performed on the property that in fact omitted and concealed from plaintiffs numerous severe structural defects; and to have certified falsely that work was satisfactorily completed.

Sarlo contends that absent an underlying claim for fraud, the conspiracy claim cannot stand. However, as noted above, the fraud claims are adequately pled against other defendants, so the only inquiry is whether the elements of conspiracy are alleged. Plaintiffs not only have alleged that Sarlo entered into and agreed with the other defendants, but also have alleged facts to show the purportedly corrupt nature of the agreement, including concealing significant problems with the required rehabilitation (which if disclosed, may have disqualified the property for eligibility for a 203k rehabilitation loan). These acts not only constitute the overt acts required but are significant facts that tend to establish the existence of a corrupt agreement.

*13 [12] As to plaintiffs' Section 349 claim for deceptive practices, plaintiffs have sufficiently alleged the elements of a deceptive acts claim. Sarlo is alleged to have engaged in deceptive acts, including making misleading statements regarding the condition of the property and falsely certifying that work was completed in order to permit other defendants to withdraw money from escrow. The deceptive conduct is consumer oriented, in that the role of the inspector is to provide consumers like plaintiffs with the proper inspections necessary to secure government-sponsored rehabilitation loans. Finally, plaintiffs adequately allege that their injury is the result of the false inspections (since an inspection that revealed all the defects would have more likely than not prevented the sale) and a result of the certifications (since those moneys in escrow were released based on the certifications Sarlo provided).

Sarlo next argues that Section 349 provides a statutory defense that warrants dismissal. The law provides that
> In any such action [under § 349] it shall be a complete defense that the act or practice is, or if in interstate commerce would be, subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission or any official department, division, commission or agency of the United States as such rules, regulations or statutes are interpreted by the federal trade commission or such department, division, commission or agency or the federal courts.

N.Y. Gen. Bus. § 349(d). Sarlo argues that since his inspection report was prepared in his role as a HUD consultant, he is entitled to that complete defense. However, as plaintiffs note, the Complaint alleges that the inspection report failed to identify structural flaws in order to qualify the mortgage for 203(k) administration by HUD. In other words, plaintiffs allege that Sarlo's inspection did not comply with HUD regulations. Interpreted as such, Sarlo's defense under § 349(g) will have to await the completion of discovery.

*CONCLUSION*

For the foregoing reasons, the motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) should be denied, except that Golden's and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2003 WL 21251584 (E.D.N.Y.)  
**(Cite as: 2003 WL 21251584 (E.D.N.Y.))**

Page 13

Weintraub's motions to dismiss the fraud-based claims are granted as described above.

SO ORDERED.

2003 WL 21251584 (E.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

. <u>1:01CV08508</u>          (Docket) (Dec. 21, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.